**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**BRYAN OMAR ROA,**<br><br>**Defendant.** | **CASE NO. 2:26-CR-00113 (6)**<br><br>**JUDGE EDMUNDA A. SARGUS, JR.** |

**UNITED STATES OF AMERICA'S RESPONSE TO DEFENDANT'S PETITION FOR REVIEW OF MAGISTRATE JUDGE'S ORDER OF DETENTION**

Now comes the United States of America, by and through counsel, Dominick S. Gerace II, United States Attorney, Damoun Delaviz and David J. Twombly, Assistant U. S. Attorneys, and James M. Donnelly, Trial Attorney, and respectfully submits the following Response to Defendant Bryan Omar Roa's Petition for Review of Magistrate Judge's Order of Detention. (Doc. 102, PageID 463). For the reasons below, the Defendant's Petition should be denied.

Respectfully submitted,

DOMINICK S. GERACE II
United States Attorney

By: /s Damoun Delaviz

DAMOUN DELAVIZ (PA 309631)
Assistant United States Attorney
221 E. Fourth Street, Suite 400
Cincinnati, OH 45202
(513) 684-3711
Damoun.Delaviz@usdoj.gov

DAVID J. TWOMBLY (OH 92558)
Assistant United States Attorney

303 Marconi Boulevard, Suite 200
Columbus, OH 43215
(614) 469-5715
David.Twombly@usdoj.gov

JAMES M. DONNELLY (NJ 050901994)
U.S. Department of Justice, Trial Attorney
950 Pennsylvania Avenue, NW 20530
(202) 514-9866
James.Donnelly3@usdoj.gov

## I. PROCEDURAL BACKGROUND

On June 14, 2026, a criminal complaint was filed in the Central District of California, charging Defendant Bryan Omar Roa with Conspiracy to Commit Murder, in violation of 18 U.S.C. § 1117. (C.D. Ca. case number 5:26-mj-418, Doc. 1: Complaint, PageID 1). Another individual, Michael Alan Thomas, was also charged in the complaint. (*Id.*). The complaint alleged that Mr. Roa, Mr. Thomas, and others, had agreed to kill individuals in Washington, D.C., at the Ultimate Fighting Championship ("UFC") event ("UFC Freedom 250"). (*Id.*, PageID 2-26). After Mr. Roa's arrest on June 13, 2026, a hearing was held on June 15, 2026. (C.D. Ca. case number 5:26-mj-418, Doc. 7: Minutes of Initial Appearance, PageID 40). The court ordered that Mr. Roa be detained. (C.D. Ca. case number 5:26-mj-418, Doc. 11: Complaint, PageID 46). That criminal complaint was dismissed on June 29, 2026, after a similar complaint in the Southern District of Ohio, discussed below, was filed. (C.D. Ca. case number 5:26-mj-418, Doc. 22: Order, PageID 72).

On June 27, 2026, a criminal complaint was filed in the Southern District of Ohio, charging Mr. Roa with Conspiracy to Commit Murder, in violation of 18 U.S.C. § 1117. (S.D. Oh. case number 2:26-mj-418, Doc. 1: Complaint, PageID 1). The allegations in this complaint arose from the same set of facts as those addressed in the Central District of California complaint. (*Id.*). Mr. Roa was arrested on this complaint on June 30, 2026, still in the Central District of California. (C.D. Ca. case number 5:26-mj-458, Doc. 2: Report Commencing Criminal Action, PageID 1). Mr. Roa appeared before a magistrate judge in that district, and Roa was again ordered detained in that district. (C.D. Ca. case number 5:26-mj-458, Doc. 2: Report Commencing Criminal Action, PageID 2; Doc. 5: Minutes of Arrest on Out of District Warrant, PageID 30; Doc. 7: Order of Detention, PageID 33).

On July 9, 2026, a grand jury in the Southern District of Ohio returned an indictment, charging Mr. Roa, Mr. Thomas and six other individuals with two violations of federal law: Conspiracy to Provide Material Support to Terrorists, in violation of 18 U.S.C. § 2339A, and Conspiracy to Commit Murder within the Special Territorial Jurisdiction of the United States and to Murder an Officer of Employee of the United States, in violation of 18 U.S.C. § 1117. (S.D. Oh. Case number 2:26-cr-113, Doc. 33: Indictment, PageID 134). The allegations in the indictment arose from the same set of facts as the prior complaints. (*Id.*, PageID 134-45).

Mr. Roa first appeared in this district on July 31, 2026, when he was arraigned before a magistrate judge. Roa entered a plea of not guilty. (S.D. Oh. case number 2:26-cr-113, Doc. 67: Minutes of Proceedings, PageID 388).

Mr. Roa filed the instant Petition for Review of Magistrate Judge's Order of Detention on September 25, 2026, seeking to be released from custody. (S.D. Oh. case number 2:26-cr-113, Doc. 102: Petition for Review of Magistrate Judge's Order of Detention, PageID 463).

## II. FACTUAL BACKGROUND

On the night of Wednesday, June 10, 2026, a concerned mother in this district contacted local law enforcement after she had noticed concerning behavior by her son, Tycen Proper, including firearms purchases and communicating with individuals online. Mr. Proper is a 20-year-old male, and he is a co-defendant in the instant matter. Officers responded to the family home and spoke with the mother, Mr. Proper and other family members, including Mr. Proper's father. Mr. Proper's father stated that Mr. Proper had recently met several people online and had been planning "recons" with these individuals. His father explained how Mr. Proper had met these individuals online and was planning to leave on the upcoming weekend (the weekend of June 13 & 14, 2026, when UFC Freedom 250 was scheduled) to meet up with these online

individuals. His father further stated that Mr. Proper had recently used a portion of approximately $3,000 of money received for his high school graduation to acquire camping gear, food, ballistic plates, a new shotgun, a rifle, "lots" of ammunition, extra magazines, and plate carriers. Mr. Proper's father also stated that Mr. Proper had recently quit his job in preparation to meet the individuals he had been interacting with online to conduct "missions" and "recons."

Officers took pictures of the equipment Mr. Proper had acquired; that equipment included: several boxes of ammunition (estimated by law enforcement to be in the thousands of rounds of ammunition), two plate carriers with AR-style magazines, an AR-style rifle, and a bullpup (i.e., compact in length) shotgun painted with an American flag. The equipment was turned over voluntarily by the family to law enforcement.

At the conclusion of the encounter, Mr. Proper was transported by the Knox County Sheriff's Office to a local hospital where an application for emergency admission based on homicidal ideations was submitted.

The Knox County Sheriff's Office contacted the Federal Bureau of Investigation ("FBI") as a result of its interactions with Mr. Proper. An FBI investigator spoke with Mr. Proper's mother; their conversation confirmed much of the information that she initially provided to law enforcement and included additional information, including that she had observed Mr. Proper recently engaged in physical training, which she initially thought was to further his aspirations to join the military or police, but later learned was in relation to the online group in which he was participating. She also stated that she recently observed Mr. Proper researching and mapping locations in the area just northwest of Washington, D.C. She stated that she also observed additional images and maps being sent to him from unknown individuals through texts and Discord messages and would overhear Mr. Proper talking to these individuals verbally on his

phone. When she asked him what he was doing, he stated that he could not tell her exactly what he was doing, but that they were looking at multiple different locations and intended to conduct "recon" as well as "hit and run missions." Asked by the FBI investigator what she thought Mr. Proper meant when he said "hit and run missions," Mr. Proper's mother indicated she believed that it meant conducting shootings and then leaving.

Search warrants were executed at Mr. Proper's home and on his cellular phone. At his home, investigators recovered a journal from his room that included pages in which Mr. Proper wrote that the government wants to control people and that a larger group worships a demonic figure and sacrifices children to it. The journal also had a list of approximately 46 names, which included celebrities and politicians. While on scene, investigators also observed a large quantity of boxes of spent ammunition, rounds of spent cartridge casings, and other tactical clothing. Investigators also spoke to Mr. Proper's father and grandmother, who stated that Mr. Proper had become more closed off from his family and spent most of his time online speaking to unidentified persons. Mr. Proper's family members also highlighted concerning statements he made in recent months, such as making sympathetic comments about Adolf Hitler, and posting anti-Semitic comments on Facebook.

While executing the search warrant on Mr. Proper's cellular phone, investigators observed chats on Signal groups that laid out detailed plans for an attack in Washington, D.C. with several then-unidentified coconspirators. Those chats included detailed imagery of the national capital region and maps of the area with different potential sniper locations highlighted, potential drone launch locations identified, and other detailed tactical planning.

FBI investigators also interviewed Mr. Proper in person in Columbus, Ohio. During the interview, Mr. Proper admitted to planning with others a coordinated attack against the United

States government, to take place during the UFC Freedom 250 event, which occurred on the South Lawn of the White House in Washington, D.C., on Sunday, June 14, 2026. Mr. Proper also provided additional details on the planned attack and stated that the plan as he knew it was to stage a demonstration on the north side of the White House. While the demonstration was taking place, the group would fly small, unmanned aircraft (*i.e.*, drones) laden with unspecified explosive devices which would detonate over the north side of the UFC arena. When the unmanned aircraft detonated, the intent was to force the crowd attending the UFC event and high value targets ("HVTs") to evacuate to the south. Mr. Proper stated that the plan was that members of his group would act as snipers and additional shooters, preferably with long guns, staged at the south to conduct shootings of the members of the crowd and HVTs as they fled from the explosive devices which had just been detonated.

The FBI's review of Mr. Proper's cell phone revealed chats in various applications, including encrypted applications wherein Mr. Proper and co-conspirators, including Mr. Roa, had planned the attack on June 14, 2026. For example, in chats on or about May 13, 2026, Mr. Proper stated, "I got a possible target [U.S. Senator-Victim No. 1] is senator for [the name of a state]," and in response to a question asking why attack her, he stated, "She's taken money from the Israel pro Israel lobby and supports them." On May 31, 2026, Mr. Proper sent several messages, leading with the text "These are people we're going to focus on," and then sent images of [U.S. Senator-Victim No. 2], [U.S. Senator-Victim No. 3], [U.S. Representative-Victim No. 1], and [U.S. Representative-Victim No. 2]. Images of these members of Congress appear to have been taken from the website "TrackAIPAC.com" and appear to include information about how much money each congressperson received "from pro-Israel PACS."

In an encrypted chat named "Ops Stage one (Vanguard of the Old Republic)," of which

Mr. Roa was a member, on SimpleX, coconspirator Daniel K. Eskridge, with the username "41 Fulcrum," stated the following, on June 8, 2026:[1]

> From: 41 Fulcrum
>
> Alright yall here's the idea we've come up with between us and a couple other groups but this is going to take everyone and it's going to put a hold on the other ops we have talked about. We need 5 teams of 3. One tier one operator working as a sniper, one tier one operator working as rifleman/spotter/ back up and one drone pilot per team. We select 5 locations that best suit our mission these 5 locations need to be ideal for precise sniper shots and for the drone pilot to operate from. Depending on these locations we may need to restrain the occupants for the duration of the attack. The target is ufc 250 if you don't know where that's being held look it up. Each team will get into position once each team is mission ready the green light will be given and the drone rigged with explosives will fly they will initiate the attack as soon as the drones have done their part and the attention of our opposition is on the skies and not the rooftops snipers will initiate their part of the plan eliminating HVTs first then the retaliatory forces such as SS, NG, and swat. There will be a protest going on outside the gates at that location which will help with keeping the chaos so that extraction teams can get out operators out and fall back to a location out of state to regroup and gauge the response. If all goes according to plan anyone who is willing will join the second wave as ground force. If we are successful this could be the first battle of the second American Revolution. Now who is willing and able to drop everything and be one of these 10 operators and who here is confident and capable of flying drones?
>
> Priority: Normal
>
> Status: Read
>
> Platform:
>
> 6/8/2026 2:28:53 AM(UTC+0)

In the same group chat approximately one day later, a user asked if everyone could read a "topo[graphical] map." Roa responded, "No I don't I'm being honest." The user then provided Roa with instructions on how to learn. Roa responded with, "Okay thanks" and with "And I completely understand you, when we're all locked in thing will make sense and run smoothly."

In an encrypted chat on Signal, named "Hunters," there was explicit discussion of the positions the snipers would take. After co-conspirator Abraham H. Alvarez (aka "Shepherd"), on June 10, 2026, provided a map of the area around the South Lawn of the White House and proposed sniper locations, Mr. Roa was added to the chat. As the images below show, Mr.

---

[1] Records indicate that this chat was sent at 2:28:53 AM in UTC time on June 8, 2023. For reference, that time would correspond with 10:28:53 PM on June 7, 2023 in the eastern time zone in the United States.

Alvarez summarized the plan for Mr. Roa, after Mr. Roa stated, "Ok fill me im confused." After he heard the plan, which included using snipers, Mr. Roa began to make plans to travel to Washington, D.C. with plans to pick up a co-conspirator along his way.

NOBLE 6 (CA) {Amerika}

**Replying to Viper Of the S.O.G**
Maybe it could be a side objective for noble to pick me up on his way

Ok fill me im confused

Jun 10, 2026 11:13 PM

Shepherd

I'm going to have to go over it again aren't I? Haha fuck ok take a seat let me explain

Jun 10, 2026 11:14 PM

Shepherd

Easy.



Jun 10, 2026 11:16 PM

Shepherd

June 14th there will be a cage match, a protest is planned for that day, word got out, vets are reinforcing the protestors, I have tasked some to light shit on fire. Your team takes the shot 3 snipers

Jun 10, 2026 11:16 PM [2]

[2] Investigators used electronic data gathered during the investigation to generate a more easily readable version of the chat than the PDF images of the chat. The government expects to produce this version to defense counsel in discovery.

Shepherd

Sniper 1

Jun 10, 2026 11:17 PM

Shepherd




Jun 10, 2026 11:17 PM

Shepherd

Sniper 2

Jun 10, 2026 11:17 PM

Shepherd

Thomas Jefferson memorial offers the cleanest out, it's an island, connects to the river, this sounds crazy but.. you could take the river down. And escape that way.. might need some wetsuits or some rafts ..






Jun 10, 2026 11:17 PM

Shepherd

Sniper 3

Jun 10, 2026 11:17 PM

NOBLE 6 (CA) {Amerika}

Okay i live in Cali I don't have enough funds to go to dc. Unless someone helps me

Jun 10, 2026 11:18 PM

Shepherd




Jun 10, 2026 11:19 PM

Shepherd

Sniper 3

Jun 10, 2026 11:19 PM

Shepherd

Sniper 3

Jun 10, 2026 11:19 PM

Shepherd

**Replying to NOBLE 6 (CA) {Amerika}**
Okay i live in Cali I don't have enough funds to go to dc. Unless someone helps me

Can do how much is needed

Jun 10, 2026 11:19 PM

NOBLE 6 (CA) {Amerika}

I have a 2010 Audi sedan take 91 on a full tank holds 450 miles where am I meeting up.?

Jun 10, 2026 11:21 PM

Shepherd

**Replying to NOBLE 6 (CA) {Amerika}**
I have a 2010 Audi sedan take 91 on a full tank holds 450 miles where am I meeting up.?

Missouri

Jun 10, 2026 11:21 PM

Shepherd

@Fulcrum {MO}1667 will meet you with the supplies needed pick @Viper Of the S.O.G along the way

Jun 10, 2026 11:21 PM

NOBLE 6 (CA) {Amerika}

**Replying to Shepherd**
Missouri

Whats the close city so I could give you the exact mileage

Jun 10, 2026 11:22 PM

At the end of the conversation, Mr. Roa asked about when he should travel, so that he could appropriately quit his job.

NOBLE 6 (CA) {Amerika}

Tell me when I should leave so I could quit my job.

Jun 10, 2026 11:30 PM

NOBLE 6 (CA) {Amerika}

I'll quit tomorrow

Jun 10, 2026 11:31 PM

On the following day, Mr. Roa did quit his job, and he announced it on the Hunters chat, indicating that he would leave and also pick up Mr. Scaggs.

From: 85BCE142-E674-423D-93F5-D1F97AB8BA4F NOBLE 6 (CA) {Amerika}

Hey guys I officially quit my job and should be on my way to pick up SOG

Priority: Normal

Platform:

6/11/2026 3:47:29 PM(UTC-4)

Source Info:
EXTRACTION_FFS.zip/root/private/var/mobile/Containers/Shared/AppGroup/08736F88-AB01-4418-9C7E-6D2AD6F1FA81/grdb/signal.sqlite/signal.sqlite.decrypted : 0x433CA3 (Table: model_TSInteraction, Size: 7110656 bytes)

From: 85BCE142-E674-423D-93F5-D1F97AB8BA4F NOBLE 6 (CA) {Amerika}

I'm leaving tonight.

Priority: Normal

Platform:

6/11/2026 3:47:47 PM(UTC-4)

Source Info:
EXTRACTION_FFS.zip/root/private/var/mobile/Containers/Shared/AppGroup/08736F88-AB01-4418-9C7E-6D2AD6F1FA81/grdb/signal.sqlite/signal.sqlite.decrypted : 0x433B88 (Table: model_TSInteraction, Size: 7110656 bytes)

Mr. Roa did indeed leave, indicating later that he was "en route." He also indicated that gas was "the issue for [him] at the moment." He shared his CashApp QR code. Others, including Mr. Thomas, sent him money. He started driving, but his car broke down after approximately 50 miles. He shared the news with the Hunters group, stating, "Guys I'm Stuck my battery died."

Later, after investigators had identified Mr. Roa, they spoke with him. He stated that he spent free time shooting his AR-15 rifle and Glock pistol, mostly shooting in an area in the

California desert. He stated that he believed he had a wider vision of the world compared to many people, whose focus is narrower. Because of this wider vision, he could feel overwhelmed by the problems of the world. Mr. Roa indicated that the government exercised power over the people and that the government's focus was on its own interests, whereas people should exercise power over the government and the government should take care of its people. Mr. Roa indicated that he felt that it had been this way for a while and that he would rather have government focus resources on the people and not on the elite. Mr. Roa recounted attending a protest and seeing people be pepper sprayed. He described the experience as terrifying. After this experience, he did not believe that protests were effective. He felt that as long as protests were used, the rich would continue to oppress people. He felt the people should fight back. Mr. Roa stated that he learned about UFC Freedom 250 through TikTok and wanted to go to a protest against the event and wasteful government spending. He stated that this protest would be different due to it being bigger and that he wanted to see the White House. Mr. Roa planned on driving cross-country to get to Washington D.C. with only gas money and was planning on sleeping in his car. Mr. Roa was planning on making his attendance at the UFC event as part of his broader move to a life on the road, which is why he was bringing his rifle and pistol.

During the interviews with Mr. Roa's family members, investigators learned that Mr. Roa had told a family member that one day they would wake up and he would be gone and that he intended to travel to Washington D.C. where "something big" would happen. One family member indicated that for approximately one month prior, Mr. Roa began going shooting at night, which was unusual for him. When asked why he was night shooting, Mr. Roa told the family member, "Do you really want to know?" Multiple family members told law enforcement that Mr. Roa had been planning a trip to Washington, D.C. Mr. Roa's family members also

believed he intended to commit an act of violence during this trip due to his increased time spent shooting his weapons and a noticeable change in behavior including increased anxiety, irritation, and seclusion. Family members also stated that within the last three months, Mr. Roa began spending more time with a new group of online friends.

FBI's review of Mr. Roa's phone revealed evidence that Mr. Roa was concerned with detection by law enforcement. In a SimpleX chat with Mr. Eskridge, Mr. Roa asked, "Any tips on researching with out getting traced.??" Mr. Eskridge responded by providing Mr. Roa with instructions from a "tech friend" about how to evade law enforcement detection on the internet. Additionally, Mr. Roa sent a message to Mr. Thomas on SimpleX about purchasing tracers and magazines. Mr. Thomas instructed Mr. Roa to download a different encrypted application, Signal. Mr. Thomas said to Mr. Roa, "Get signal. I want to pop you in a couple chats." The FBI's initial review of Mr. Roa's phone indicated that Mr. Roa had downloaded Signal on his phone but that the application had then been deleted, possibly at or around the time law enforcement executed a search warrant on June 13, 2026.

In a Signal chat discovered on the electronic device of a co-conspirator, Mr. Roa indicated disappointment that he wasn't able make it to Washington, D.C. Mr. Roa stated, "Hey man had to go back I believe my wiring harness is fucked." The co-conspirator responded, "Yeah I heard I'm terribly sorry that happened to you brother the op is canceled but it buys us more time are you okay brother." Roa stated, "Tbh I was disappointed, I was eager to get out and shit hit the fan."

A search warrant was executed on Mr. Roa's car, the 2010 Audi A4. There was a multitude of items recovered from the vehicle, including an Andro Corp AR-style multi-caliber rifle, a Glock 19 pistol, 2 pistol magazines, 2 rifle magazines, a black in color optics device

designed to be attached to a firearm, a tactical hearing protection and communication device, a Baofeng radio and charger, and a rifle laser.

During a review of the evidence gathered in this matter, investigators also learned that Mr. Roa and Mr. Thomas met in southern California on or about May 24, 2026 so that they could practice their marksmanship.

## III. LEGAL STANDARD

As this Court knows, a defendant must be detained pending trial if a judicial officer concludes that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). In making this determination, a court considers the following factors: (1) the nature and circumstances of the offense, including whether the offense involved a firearm; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g)(1)-(4).

A finding of a risk of non-appearance must be supported by a preponderance of the evidence, and a finding of dangerousness must be supported by clear and convincing evidence. *United States v. Hinton*, 113 F. App'x 76, 77 (6th Cir. 2004).

A district court is empowered to review a magistrate judge's pretrial detention order. If a magistrate judge orders that a defendant be detained pending trial, the defendant "may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." 18 U.S.C. § 3145(b). The district court reviews a magistrate judge's decision *de novo*. *United States v. Mehmed*, 748 F. Supp. 3d 549, 552 (S.D. Ohio 2024). To that end, the district court "should not defer to the magistrate judge's ultimate conclusion," but instead should

"make its own '*de novo*' determination of facts[.]" *United States v. Yamini*, 91 F. Supp. 2d 1125, 1128 (S.D. Ohio 2000) (citations omitted). In conducting this *de novo* review, the district court "should engage in the same analysis, with the same options, under § 3142 as the magistrate judge." *United States v. Peraza*, No. 3:24-CR-045, 2024 U.S. Dist. LEXIS 227907, at *2 (S.D. Ohio Dec. 17, 2024). The district court has the discretion to rely on the existing record, make new factual findings, accept additional evidence, or conduct a new hearing. *See United States v. Dominguez*, 509 F. App'x 28, 30 (2d Cir. 2013) ("On Section 3145(a) review, the district court was free to review the magistrate judge's factual findings *de novo*, and make new factual findings."); *United States v. Cidraz-Santiago*, 18 F. Supp. 3d 124, 126 (D.P.R. 2014) ("A district court may take additional evidence or conduct a new evidentiary hearing when appropriate."); *United States v. Dai*, No. 3:23-CR-478, 2023 U.S. Dist. LEXIS 237124, at *4 (N.D.N.Y. Dec. 19, 2023) (observing that district court "may rely on the record developed before the magistrate judge and may also accept additional evidence"); *United States v. Levine*, 770 F. Supp. 460, 464 n.7 (N.D. Ind. 1991) ("The decision whether to allow a defendant to present or proffer additional evidence in a § 3145(b) hearing rests within the district court's discretion."); *United States v. Martinez*, No. 1:12-CR-210, 2012 WL 4815018, at *1 (W.D. Mich. Oct. 10, 2012) ("The Court may receive additional evidence or rely on the record of the earlier hearing.").

A motion for review of a detention order "shall" be decided "promptly." 18 U.S.C. § 3145(b).

## IV. <u>ARGUMENT</u>

### a. The Nature and Circumstances of the Offense

Mr. Roa planned for and took steps to carry out a plan of staggering significance and violence: an armed attack on the South Lawn of the White House, involving explosives and

executions. The evidence shows that Mr. Roa didn't just talk about committing these acts of violence. He trained in marksmanship, packed his vehicle with weapons and tactical gear, and started driving to meet with co-conspirators on the way to Washington, D.C. Greater threats to the safety of the community do not easily come to mind. In the process, Mr. Roa sought out and practiced methods to avoid detection by law enforcement.

b. The Weight of the Evidence Against the Defendant

As the Sixth Circuit has explained, "this factor goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt." *United States v. Stone*, 608 F.3d 939, 948 (6th Cir. 2010). However, in cases like this one, the weight of the evidence of dangerousness overlaps substantially with evidence of the defendant's guilt on the pending charges. *See United States v. Busbin*, No. 3:24-cr-182, 2024 WL 1313880, at *5, n.13 (M.D. Tenn. Mar. 27, 2024) ("[T]he weight of the evidence of dangerous[ness] can, in some cases, be enhanced by substantial weight of the evidence of guilt; this is because when the charges against a defendant themselves reflect dangerous conduct, evidence of guilt on those charges in some cases tends to reflect an ongoing danger to other persons or the community.").

Here, there is ample evidence that Mr. Roa poses a danger to the community and a risk of flight. First, as to danger to the community, Mr. Roa's efforts were not stopped by regret, second thoughts, or misgivings. His car stopped working, and as a result, he wasn't able to carry out the attack that he intended to carry out. In the aftermath, he was disappointed. He wished he could have carried out the attacks.

Furthermore, the Sixth Circuit has recently underscored the danger that online conduct poses to the community. *United States v. Wagner*, 187 F.4th 372, 382 (6th Cir. 2026) ("Wagner's 'threatening statements regarding law enforcement officers' are also strong evidence

that he 'would pose a serious danger to the community if released' pending trial."). Here, Mr. Roa's crime is more serious – he agreed with others to commit violent and harmful acts, and he himself took extensive measures to turn that agreement into reality.

As to risk of flight, Mr. Roa was worried about avoiding detection. He discussed it in the chat leading up to the attack. He regularly communicated with his co-conspirators and others using encrypted applications. The reasonable and logical sequitur to those actions by Mr. Roa is that if he were released from custody, he could use those same techniques to not comply with the conditions of release, to flee from prosecution, or to commit additional crimes.

c. The History and Characteristics of the Defendant

Although Mr. Roa has no criminal history, "a prior record of violence is not essential to proving that a defendant is dangerous for detention purposes." *Wagner*, 187 F.4th at 383.

Furthermore, Mr. Roa's reliance on the pretrial services report does not serve him well. Mr. Roa was interviewed for the report by officers in the Central District of California ("CDCA"). In the original pretrial services report, filed in CDCA, Mr. Roa was found to be a danger to the community and detention was recommended. Mr. Roa's motion does not challenge the factual conclusions in this original CDCA report. In the original report, Mr. Roa indicated that he lived at a home with his father and siblings, and that his mother lived in Mexico. He stated he spoke with her "on an occasional basis." Because Mr. Roa did not provide his father's contact information (despite living with his father prior to his arrest), pretrial services in CDCA could not confirm the background information Mr. Roa provided. In this district, pretrial services did not interview Mr. Roa, and it was similarly unable to reach his father, the parent with whom Mr. Roa lived. Instead, pretrial services in this district relied on information from Mr. Roa's mother – with whom he spoke only occasionally and who lived in a different country.

Pretrial services in this district does not explain in its addendum to the report why it differed from its sister office in recommending release, apparently only on the basis of an interview with a parent living abroad. The addendum does not appear to consider the possibility that a potential home outside the United States makes Mr. Roa a greater flight risk than usual.

Lastly, neither the pretrial services report in this district nor Mr. Roa propose an appropriate location to which Mr. Roa should be released. To the government, it would not be appropriate for him to return to the home where he was living when he committed these crimes. Although he used to live with his father there, that did not stop him from engaging in the dangerous conduct for which he is charged, and his father's inability to be reached by pretrial services officers bodes ill for future monitoring.

d. The Nature and Seriousness of the Danger to Any Person or the Community that Would be Posed by the Defendant's Release

Mr. Roa is charged with very serious crimes. Not only did he plot to commit murders, but he plotted them as acts of terrorism that would strike at American government. And he acted in concert with others, significantly increasing the likelihood of success. His crimes were not defeated by misgivings or prudence. Instead, he was stopped only because his car broke down, and he lacked the resources to complete his mission. Afterwards, he was disappointed that he had failed. Mr. Roa poses a grave danger to the community.

Pretrial services in this district has offered a long list of special conditions to address Mr. Roa's dangerousness and risk of nonappearance, but the Sixth Circuit has recently pointed out the fundamental shortcoming of such conditions: they "hinge on [his] good faith compliance." *Wagner*, 187 F.4th at 383 (cleaned up). This is especially true with respect to crimes like this one that "involve communications with others." *Id.* As indicated above, there is ample evidence to indicate that Mr. Roa is capable of evading effective monitoring by a pretrial officer.

"Nothing in the Bail Reform Act requires dangerous defendants to be at large based upon their promise not to violate conditions of bail." *Id.*

## V. CONCLUSION

For all of the foregoing reasons, the United States asks that this Court deny Mr. Roa's Petition.

Respectfully submitted,

DOMINICK S. GERACE II
United States Attorney

By: /s Damoun Delaviz
DAMOUN DELAVIZ (PA 309631)
DAVID J. TWOMBLY (OH 92558)
Assistant United States Attorneys
JAMES M. DONNELLY (NJ 050901994)
Trial Attorney